# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**UNITED HEALTHCARE SERVICES,
INC.,** *et al.***,**

        **Plaintiffs,**

    **v.**

**JEFFREY CORZINE,**

       **Defendant.**

**Case No. 2:21-cv-319
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. (ECF No. 2.) Defendant Jeffrey Corzine submitted a Response in Opposition (ECF No. 25), and Plaintiffs replied (ECF No. 31). The Court held an evidentiary hearing on Plaintiffs' motion on February 19 and February 22, 2021. The parties submitted post-hearing briefing on the testimony and have each responded to the other side's briefing. (ECF Nos. 32–35.) For the reasons set forth below, Plaintiffs' Motion for a Preliminary Injunction is **GRANTED IN PART**.

## I. FINDINGS OF FACT

Plaintiffs United HealthCare Services, Inc. and UnitedHealth Group, Inc. (collectively, "United") initiated this action against Defendant Jeffrey Corzine seeking enforcement of non-competition and non-solicitation covenants to which Corzine agreed while employed at United.

UnitedHealth Group, a Delaware corporation based in Minnesota, is a national diversified health care company offering health care coverage and benefits through a family of affiliate companies. (Roaldi Decl. ¶ 3.) United HealthCare Services, one of those affiliate companies, is UnitedHealth Group's health care benefits business. (*Id.*) United HealthCare Services offers

commercial health insurance as well as insurance for Medicaid and Medicare beneficiaries.  (*Id.* ¶ 4.)  The UnitedHealthcare Community Plan of Ohio, Inc. ("Ohio plan") operates under a contract with the Ohio Department of Medicaid ("ODM") as a benefits plan for Ohio Medicaid beneficiaries—known as a "managed care organization" or "managed care plan."  United obtained this contract through a competitive procurement in 2012.

Defendant Jeffrey Corzine began employment with United's Ohio plan in 2008.  From 2014 to 2019, Corzine worked in a strategic marketing role for the Ohio plan.  United terminated Corzine in October of 2019 after a national restructuring.  Corzine was subsequently hired by Humana, Inc. in February of 2020.  Like United, Humana is large health care company that offers health care benefits, among other services.  At the time Humana hired Corzine, Humana operated managed care plans under Medicaid contracts with other states, but not Ohio.  However, Humana was actively preparing to enter the Ohio Medicaid market in anticipation of ODM re-procuring the State's Medicaid contract.  In the fall of 2020, ODM initiated the procurement by issuing a Request for Applications, the standard process used to procure a state Medicaid contract.  United and Humana, along with nine other managed care organizations, both submitted applications to obtain a contract with ODM.

This dispute began when United learned in January of 2021 that Corzine was involved in Humana's application to ODM.  United alleges that Corzine's activity at Humana breached the non-competition and non-solicitation covenants contained in Stock Option Awards and Restricted Stock Unit Awards that Corzine signed while at United.

### A.  The Ohio Medicaid Business and the UnitedHealthcare Community Plan

This case requires background knowledge of the Ohio Medicaid market.  Each state administers Medicaid differently.  Ohio contracts with private health insurance companies to

2

provide benefits to Medicaid members through a competitive procurement process. To initiate a competitive procurement, the State issues a Request for Applications ("RFA"). Companies seeking to provide managed care services submit detailed applications per the prompts listed in the RFA. The State then selects organizations from the pool of applicants. At a basic level, ODM contracts with the selected managed care plans and those plans cover the medical benefits, "including behavioral health services and prescription drugs," for the individuals enrolled in the plan. (Ex. 159.) The State pays the managed care organizations, and the organizations pay the claims submitted by the Medicaid members enrolled in the plan. Over 3 million Ohioans are covered under the Ohio Medicaid program.

Ohio last issued an RFA in 2012. The State selected United and four other plans to provide benefits under the State Medicaid contract beginning in 2013. According to Michael Roaldi, the CEO of United's Ohio plan, the State selects multiple providers to encourage competition and give Medicaid members choice between competing plans. When a person becomes eligible for Medicaid, the person has an option to enroll in a healthcare plan of their choice or to do nothing. If the person does nothing, ODM assigns that person to one of the competing plans based on a computer algorithm. The computer algorithm accounts for the performance metrics of each plan as evaluated by ODM; better performance can result in a higher number of Medicaid members assigned to a plan. ODM also divides the State into three regions. Based on performance, some plans are given the choice to service only particular regions, while other plans are selected to service all regions. Under the current Medicaid contract, roughly half of Ohio's Medicaid members are served by CareSource, a non-profit. That leaves the remaining 1.5 million Medicaid beneficiaries to the other four plans.

United's current Ohio plan provides coverage to roughly 350,000 Ohio Medicaid

beneficiaries in all three regions.  The plan employs a CEO and other executive leadership, nurses and community health workers, quality staff, and operations staff.  Roaldi testified that the plan has over 300 employees.  The plan considers its business to have two distinct customers.  First is the State of Ohio; the State "hires" the plan and dictates how and where it operates.  Second is the Medicaid member the plan insures.  The RFA process is the only way for a company to enter the Ohio Medicaid market.

### B.  The 2020 Ohio RFA

In January of 2019, Governor Michael DeWine announced that the State intended to re-procure Ohio's Medicaid contract. Prior to Governor DeWine's announcement, United had held occasional strategy meetings to stay prepared in case a new RFA was released.  According to Roaldi, it is vital for a managed care plan to stay prepared for a new procurement because the State has discretion end the current contract and request applications for a new Medicaid contract at any time.  After Governor DeWine's announcement, the company moved into the "active solutioning phase" to prepare for the RFA.  United created a "core group" of employees from the Ohio plan and from United's national Medicaid team.  The core group held daily meetings to strategize for the RFA's release.  The questions and criteria for the RFA are unknown until the RFA is released. But in the 18 months leading up to the 2020 RFA's release, ODM made public announcements indicating its priorities for the upcoming procurement.  United's executive leaders strategized for the upcoming RFA based on these statements and on the plan's experiences operating under the current contract since 2013.

ODM issued the 2020 RFA on September 30, 2020.  (Ex. 159.)  Written applications were due on November 20, 2020.  (*Id.*)  The RFA asked applicants to respond to questions in the following topic areas: (1) the organization's qualifications and experience; (2) population health;

4

(3) benefits and service delivery; and (4) operational excellence. Applications are typically hundreds of pages long and are highly confidential until the awards are announced. An Evaluation Committee grades the applications. Each topic area has a maximum number of points available, and a total of 1000 points are available on the written application. In addition to the written response, the application includes an oral presentation for 100 additional points on the grading rubric, for a total of 1100 available points. (*Id.*) The 2020 RFA allocates a significant amount of points to the "population health" topic, something not mentioned at all in the 2012 RFA. (Ex. 159.) ODM describes "population health" as an approach to Medicaid that is "designed to address health inequities and disparities and achieve optimal outcomes for the holistic well-being of individuals receiving Medicaid." (*Id.*) An important component of population health is the "social determinants of health," what ODM describes as the "complex, integrated, and overlapping social and economic risk factors that impact health outcomes and health statuses." (*Id.*)

### C. Corzine's Role at United and his Termination in the Fall of 2019

Defendant Jeffrey Corzine has worked in the Ohio Medicaid industry since 1985. Prior to joining the UnitedHealthcare Community Plan of Ohio in 2008, Corzine worked for many years as a regulator for ODM and ODM's precursor in the Ohio Department of Job and Family Services. In 2008, Corzine received an offer from Unison Health, which had just been acquired by United. Unison Health had a Medicaid plan in Ohio, which became United's plan after the acquisition. Corzine's first role at United was the Chief Operating Officer of United's Ohio plan. After the 2012 RFA process and the issuance of a new Medicaid contract in 2013, Corzine transitioned into a marketing role as Vice President for Strategic Account Development, in which he worked until his termination in 2019.

In his strategic account development role, Corzine focused primarily on developing and

maintaining relationships with "external stakeholders" to support the plan's goals.  Corzine also sought to identify innovative business opportunities for the plan with a particular focus on the social determinants of health.  Roaldi explained that there are several external stakeholders important to the Ohio Medicaid program, such as hospitals, physician groups, policy thinktanks, and community organizations.  Maintaining positive relationships with these stakeholders is critical to improving the performance and impression of the plan.  Corzine was also a key point of contact between United and ODM.  According to Roaldi, Corzine worked with ODM officials on a weekly or even daily basis to gain insight into their priorities and relay the information back to United's executive leadership team.  Corzine's annual self-reviews show that he maintained relationships with a variety of organizations, committees, agencies, and state legislators on behalf of the United plan.

Corzine testified that the Medicaid landscape leading up to the 2020 RFA was vastly different from 2012.  Between the two RFAs, significantly more and different populations had been added to Medicaid; ODM had changed directors three times; and, in 2017, ODM expanded its behavioral health benefit from 16 billable codes to over 50 billable codes and integrated this behavioral health benefit into the managed care benefits for the first time, which Corzine described as a significant change.  Corzine's annual self-review for the calendar year 2016 shows that he participated in all behavioral health redesign meetings hosted by ODM and the Ohio Department of Mental Health and Addiction Services.  (Ex. 128.)  In his review for the calendar year 2018, Corzine stated that he "participated in more than 2 dozen meetings with Legislators on budget, Medicaid Extension, [Behavioral Health] and general Managed care issues."  (Ex. 95.)

In early 2019 when United ramped up its RFA preparation, United asked Corzine to assist the solutioning team in preparation for the RFA.  Corzine testified that as a "local subject matter

expert," his role during these strategy meetings was to give his insight on the community and "how organizations were feeling and what they felt might be important to them if they had the opportunity to weigh in."  Corzine participated in United's weekly confidential RFA strategy meetings in 2019.

For example, in March 2019, Corzine attended the first strategy meeting following Governor DeWine's RFA announcement in January.  Corzine vaguely recalled the meeting, but Roaldi (who was also present) testified that Corzine was a key participant and that Corzine gave a presentation on the social determinants of health.  (*See* Ex. 36.)  Subsequent strategy meeting agendas featured Corzine.  During the August 7, 2019 strategy meeting, Corzine was the lead presenter and gave "Ohio Leadership updates." (Ex. 35.) Much of the information Corzine utilized for these meetings was public information.  But Roaldi testified that Corzine was not just relaying public information to the core group.  Rather, Corzine was providing his interpretation of the relevance of the information for United's RFA bid strategy.  During these meetings, the United team discussed the plan's strengths and weaknesses relative to ODM's priorities.

In the fall of 2019, United's national leadership decided to eliminate marketing positions at state health plans.  Employees in these roles, like Corzine, were either terminated or offered a position with United's national group.  In early October 2019, United informed Corzine that it was terminating his employment and providing him with 18 weeks' severance pay; United did not offer him a position at the national level.  Prior to Corzine's final day, but after he had learned of his termination, Corzine participated in a strategy meeting titled "RFA Preparations: Strategy and Solution Review" with a third-party consulting firm. (Ex. 40.)  Corzine also created a spreadsheet of his work activities at the time of his termination so that Roaldi could determine whether any of Corzine's efforts needed to continue.  (Ex. 27.)  The spreadsheet details the array of organizations

with which Corzine maintained contact on behalf of the United plan. (*Id.*) It also details his activities related to United's RFA preparation. Corzine described his RFA activities as:

> "Subject matter expert, assist various working Committees as needed in development of RFA response materials, listening session visits with stakeholders. Assist where needed and requested: Stakeholder listening sessions; Ohio Investments Check in meeting; Strategic Engagement; Ohio Reprocurement Meetings; Ohio Milestone Checkpoint meetings; RFA Touchbase meeting with C&S PM."

(*Id.*) Corzine's final day with United was October 16, 2019. Because Corzine's employment was terminated 11 months before ODM released the RFA, Corzine did not play a role in drafting United's written application. Corzine also testified that he did not take any of United's confidential material with him after his termination, and the Court finds that his testimony is credible.

### D. The Covenants

Throughout his employment with United, Corzine was given Stock Option and Restricted Stock Unit Awards. The overall value of Corzine's equity comes out to roughly $162,000. On February 26, 2019, Corzine signed a Stock Option Award and a Restricted Stock Unit Award. (Exs. 93, 94.) The Option Award granted Corzine 321 option shares at the price of $262.98. (Ex. 93.) The Restricted Stock Unit Award ("RSU Award") granted Corzine 58 units, with a final vesting date of February 26, 2023. (Ex. 94.)

The two agreements contain similar non-competition, non-solicitation, and non-disclosure covenants. Only the non-competition and non-solicitation provisions are at issue in this case. The covenants in the Option Award and RSU Award apply on a nationwide basis anywhere in the United States. (Ex. 93, §4(d); Ex. 94, § 8(d).) Both contain nearly identical non-competition and non-solicitation covenants. (Ex. 93, § 4(b), (c); Ex. 94, § 8(b), (c).)

### 1. Covenants in the Option Award

**Non-competition.** The non-competition provision provides, in relevant part:

8

"During the Optionee's employment and *for the greater of one year after* termination of the Optionee's employment for any reason whatsoever *or* the period of time for which the Option remains exercisable, the Optionee may not …directly or indirectly …:

> (i) Engage in or participate in any activity that competes, directly or indirectly, with any Company activity, product or service that Optionee engaged in, participated in, or had Confidential Information about during Optionee's last 36 months of employment with the Company; or

> (ii) Assist anyone in any of the activities listed above."

(Ex. 93, § 4(c) (emphasis added).)

**Non-solicitation.** The non-solicitation provision provides, in relevant part:

> During the Optionee's employment and for the *greater of two years after* the termination of the Optionee's employment for any reason whatsoever, *or* the period of time for which the Option remains exercisable, the Optionee may not … directly or indirectly …:

> (i) Solicit or conduct business with any business competitive with the Company from any person or entity: (A) who was a Company provider or customer within the 12 months before Optionee's employment termination and with whom Optionee had contact regarding the Company's activity, products or services … or about whom the Optionee learned Confidential Information during employment related to the Company's provision of products or services to such Company provider or customer.

(*Id.* § 4(b) (emphasis added).)

### 2. Covenants in the Restricted Stock Unit Award

**Non-competition.** The non-competition provision of the RSU Award provides, in relevant part:

> "During Participant's employment and for *one year after the later of* (i) the termination of Participant's employment for any reason whatsoever *or* (ii) the last scheduled vesting date under Section 4, Participant may not … directly or indirectly …:

> (i) Engage in or participate in any activity that competes, directly or indirectly, with any Company activity, product or service that Optionee engaged in, participated in, or had Confidential Information about during Optionee's last 36 months of employment with the Company; or

(ii) Assist anyone in any of the activities listed above."

(Ex. 94, § 8(c) (emphasis added).)

**Non-solicitation.**  The non-solicitation provision of the RSU Award provides, in relevant part:

> During Participant's employment and *for two years after the later of* (i) the termination of Participant's employment for any reason whatsoever *or* (ii) the last scheduled vesting date under Section 4, Participant may not … directly or indirectly …:
>
> (i) Solicit or conduct business with any business competitive with the Company from any person or entity: (A) who was a Company provider or customer within the 12 months before Optionee's employment termination and with whom Optionee had contact regarding the Company's activity, products or services … or about whom the Optionee learned Confidential Information during employment related to the Company's provision of products or services to such Company provider or customer.

(*Id.*, § 8(b) (emphasis added).)

**3. Alternative Durations of the Covenants**

As shown above, the non-competition and non-solicitation covenants in both agreements contain alternative durations.

In the RSU Award, the non-solicitation duration is the later of: (1) two years after termination; or (2) two years after last scheduled vesting date under Section 4 of the agreement. Same for the non-competition provision, but with a duration of one year.  The duration of Corzine's RSU Award covenants therefore depend on the last vesting date of his stock units under Section 4 of the agreement.  Section 4 provides that, ordinarily, any unvested stock units are immediately forfeited upon an employee's termination.  (*Id.*, § 4(a).)  However, if an employee is eligible for retirement at the time of termination, "the vesting of the Restricted Stock Units shall continue as if such termination had not occurred[.]"  (*Id.*, § 4(d).)  An employee is eligible for retirement if, at the time of termination, the employee is at least 55 years old with at least 10 years of employment

10

with the company.  (*Id.*, § 4(e).)  Section 4 also contains other conditions that affect the vesting dates for stock units after termination.  (*See id.*)

Corzine was eligible for retirement at the time of his termination (he was 60 years old and had 11 years of employment with United).  He also retained his restricted stock units.  So, his restricted stock units continued to vest under the ordinary vesting schedule.  Under that schedule, 25% of the restricted stock units vest on the first, second, third, and fourth anniversary of the award—meaning that the units continue to vest until vested in full four years from the date of the award.  The date of Corzine's RSU Award is February 26, 2019, meaning his units would not vest fully until February 26, 2023.  (*Id.*, § 2.)  However, the agreement provides that a party immediately forfeits any *unvested* restricted stock units upon a violation of the restrictive covenants.  (*Id.*, § 7(a).)

For the Option Award, the covenants last for the later of: (1) one year (non-competition) or two years (non-solicitation) after termination; or (2) as long as the stock options remain exercisable.  Corzine's options remained exercisable until 2029 if he had not been terminated.  For a terminated retirement-eligible employee—defined the same as under the RSU Award—the options remain exercisable for the shorter of (1) the expiration date of the options or (2) five years after the termination of employment.  (*Id.*, § 2(d).)  Applied to Corzine, his options remained exercisable for up to five years after his October 16, 2019 termination.  But, like the RSU Award, the agreement provides that the stock options are forfeited upon any violation of the agreement's restrictive covenants.  (*Id.*, § 2(f).)

### E.  Corzine's Alleged Violations of the Covenants at Humana

In early October 2019, after Corzine learned he would be terminated from United, Corzine began looking for other employment.  Among other jobs, Corzine applied for a job at Humana,

Inc.  At that time, Humana—like United—was actively preparing a bid to enter the Ohio Medicaid market whenever ODM issued the RFA to which Governor DeWine alluded in January 2019. Corzine initially applied and interviewed for Humana's "Ohio Market Leader" job posting (the CEO of Humana's Ohio Medicaid team).  The job description states that the "State Market Leader will be responsible for the overall strategic direction, oversight, and administration of programs and services for our Medicaid program in Ohio … They will publicly represent Humana Medicaid in Ohio, while enhancing and further developing relationships and stakeholders throughout the state."  (Ex. 54.)

During the application process, Corzine disclosed his United restrictive covenants to Humana.  Because of Corzine's restrictive covenants, Humana reached out to United in December of 2019 to see if United objected to Corzine working as Humana's Ohio Market Leader. (Ex. 56.) United responded that it expected Corzine to comply with his restrictive covenants. (Ex. 123.) Specifically, United informed Humana that Corzine "should not engage in any activity related to Humana providing managed care services in Ohio or any efforts to obtain a contract regarding same.  He should not share any information regarding the Ohio market or UnitedHealthcare's plan in Ohio with an individual that might work on efforts to obtain a Medicaid contract in Ohio."  (*Id.*) United did not object to Corzine working for Humana in a Medicaid role outside of Ohio.

Following the discussions about Corzine's covenants, Humana hired Corzine as its South Carolina Market Leader (the CEO of Humana's Medicaid plan in South Carolina).  Humana also continued its preparation for Ohio's upcoming RFA.  Corzine began working as Humana's South Carolina Market Leader in February of 2020.  Due to the COVID-19 pandemic, Corzine worked in this role remotely from his Columbus, Ohio home.  Humana's corporate representative testified that using Corzine in South Carolina was a short-term plan.

Beginning in March 2020, while Corzine was working as Humana's South Carolina Market Leader, Corzine began participating in weekly calls with Humana's Ohio Medicaid business development team. Corzine testified that during these meetings, he provided updates on public policy developments in Ohio, including answering the business development team's questions related to Medicaid. According to Corzine, the business development team's goal was to "make Humana known within the community at large prior to their release of a competitive bid," something that every healthy plan does. Beginning in April or May of 2020, Corzine started participating in Humana's weekly Ohio RFA planning meetings. At these meetings, Corzine provided input on Ohio Medicaid policy and provided interpretations of public statements released by ODM related to the upcoming RFA. When ODM released the RFA on September 29, 2020, the Humana team held meetings every few days to prepare its application. Corzine testified that he participated in several of these meetings between September 29 and October 15, 2020. Corzine also offered comments on early drafts of Humana's RFA application prior to October 15, 2020.

Around October 16, 2020—one year from his last day at United—Corzine transitioned from his South Carolina role into his current role as Humana's Ohio Market Leader. Corzine believed that his non-competition agreement expired one year from his termination from United. Humana did not inform United that Corzine had taken over as Ohio Market Leader. After Corzine took over as Ohio Market Leader, Corzine oversaw Humana's RFA application strategy. Corzine also participated in each level of review for Humana's RFA written application, offering substantive comments on drafts of the application. (Ex. 19.) After the November 20, 2020 deadline for the written applications, Corzine submitted a survey to the business development department regarding the Ohio RFA. On the survey, Corzine listed "Knowledge of Ohio Medicaid" and "Experience working with Medicaid managed care programs" as factors that helped

him deliver his best work on the Ohio RFA.  (Ex. 12.)

After the written application deadline, Humana continued preparation for the oral presentations slated for early January 2021.  The oral presentations account for 100 points out of the possible total of 1100 of an application's score.  Corzine, as the Market Leader, played a central role in preparation for the oral presentations.  (*See* Ex. 21.)  Corzine led of a group of seven Humana plan executives who presented on Humana's behalf at the oral presentations.  (*See* Ex. 22.)

United first learned that Corzine was involved in Humana's Ohio RFA application on January 7, 2021, just prior to the oral presentations.  ODM sent the RFA applicants an email with an attached list of questions and answers related to the upcoming oral presentation.  (Ex. 107.) Corzine and Roaldi, the United plan CEO, were both copied on the email.  Roaldi, upon seeing Corzine's Humana email address copied on the email from ODM, forwarded the email to United's in-house counsel for review.  On January 9, 2021, United's counsel wrote to Humana's counsel stating that United learned that Corzine was scheduled to give an oral presentation as part of Humana's bid, and that Corzine's conduct was "in direct violation of the non-competition and non-solicitation obligations he continues to owe to UnitedHealthcare."  (Ex. 122.)  United explained that it expected Humana to take immediate action to remedy Corzine's alleged violations.  (*Id.*)

Corzine participated in Humana's oral presentation in front of the ODM panel on January 12, 2021.  Following the presentation, Corzine sent an email to a Humana colleague with the names of the panelists during the oral presentation.  (Ex. 86.)  In an email later that day, Corzine indicated that the presentation "went well" and that he "personally knew all of the state staff on the call with the exception of one person."  (Ex. 109.)  Another Humana team member indicated that the presentation "went really well" and highlighted that "[a] number of the state staff said hello to Jeff

personally at the introduction part of the orals." (Ex. 86.) Corzine testified that he did not use any of United's confidential information during his preparations for the oral presentation and did not use any of United's strategies for the presentation. Roaldi testified that United does not have reason to believe that Corzine has used any of United's confidential information during his time at Humana.

A little over a week later, on January 20, 2021, United sent Corzine a letter informing him that he was in violation of his restrictive covenants and that his unvested equity was forfeited and considered null and void. (Ex. 171.) Corzine's last scheduled vesting date under the RSU Award occurred on February 26, 2020. Thus, United asks the Court to measure Corzine's one-year non-compete and two-year non-solicit obligations from February 26, 2020. United initiated this lawsuit on January 24, 2021 and filed a Motion for a Preliminary Injunction on the same day. (ECF Nos. 1–2.)

### F.  Current Status of the 2020 RFA Process

11 companies applied for a contract with ODM in response to the 2020 RFA. ODM's original schedule listed January 25, 2021 as the date ODM would issue award notification letters. (Ex. 159 at 5.) As it stands, over a month after that date, ODM has not issued award notifications. ODM divides the state into three regions and anticipates that it will make "multiple awards per region" but "anticipates no more than five Applicants per region." (*Id.* at 3.) Thus, there are several possible outcomes for United's and Humana's applications. Both companies could be awarded a contract to service all three regions. Both could be awarded contract to service only some regions. One could be awarded a contract while the other does not obtain a contract. And the list goes on. ODM also has discretion to throw out the applications and start over, which is considered highly unlikely.

The applicants are in a no-contact period with ODM until the award notifications are issued.  After ODM issues the award notifications, the parties have seven business days to file a protest to the award selections.  (*Id.* at 10.)  After the protest period, the successful parties will execute the Provider Agreement and are scheduled to begin providing services in January of 2022.  (*Id.* at 5.)  Humana is currently filling positions for its Ohio managed care team contingent on a successful application and a contract with ODM.  These positions will ultimately be under the supervision of Corzine.  (Ex. 113.)  If ODM awards Humana a Medicaid contract, Corzine will be leading the plan's implementation and will hire an executive leadership team.  After the contract goes live, Corzine—as the plan's CEO—will have ultimate responsibility over the plan's entire operation.

## II. PRELIMINARY INJUNCTION STANDARD

Rule 65 of the Federal Rules of Civil Procedure provides for injunctive relief when a party believes it will suffer immediate and irreparable injury, loss, or damage.  Still, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to issue a preliminary injunction, the Court must balance four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id*. (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).  These four considerations are balancing factors, not prerequisites that must be met. *Id*. (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth*., 163 F.3d

341, 347 (6th Cir. 1998)).

## III. ANALYSIS

United claims that Corzine breached the restrictive covenants in the Awards.  It seeks a preliminary injunction to prevent Corzine from working in the Ohio Medicaid market for the duration of the covenants.  As to the non-solicitation covenants, United seeks an injunction prohibiting Corzine from soliciting "the State of Ohio or any customer or prospective customer in the Ohio Medicaid and/or Medicare line of business" for a "period of 24 months from the date his last equity vested plus any additional time during the restricted period during which" Corzine breached the covenants.  As to the non-competition covenants, United seeks an injunction prohibiting Corzine from "employment at any role in Humana with responsibilities in Ohio for Humana's Medicaid or Medicare business" for a period of "12 months from the date his last equity vested plus any additional time during the restricted period" in which Corzine breached the covenants.

### A.  Likelihood of Success on the Merits

To succeed on a motion for a preliminary injunction, the plaintiff must "establish a substantial likelihood or probability of success on the merits."  *Doe v. The Ohio State Univ.*, 136 F. Supp. 3d 854, 862 (S.D. Ohio 2016) (citation and alterations omitted).  In this case, United must establish a substantial likelihood that Corzine breached his non-solicitation or non-competition covenants.

There are two contracts at issue here, the 2019 Stock Option Award and the 2019 RSU Award.  Both contain nearly identical non-competition and non-solicitation obligations. (Ex. 93, § 4(b), (c); Ex. 94, § 8(b), (c).)  The two agreements differ only in that, under the Option Award, the duration depends on the length of time the stock options remain exercisable; under the RSU

Award, the duration depends on the last date of the equity vesting. (*See id.*) United seeks to enforce Corzine's covenants based on the date of his last equity vesting under the RSU Award—February 26, 2020. (Ex. 94, § 8(b), (c).)

The non-competition covenants prohibit Corzine from "Engag[ing] in or participat[ing] in any activity that competes, directly or indirectly, with any Company activity, product or service that Optionee engaged in, participated in, or had Confidential Information about during Optionee's last 36 months of employment[.]" (Ex. 94, § 8(c).) The non-solicitation covenants state that Corzine may not: "Solicit or conduct business with any business competitive with the Company from any person or entity … who was a Company provider or customer within the 12 months before Optionee's employment termination and with whom Optionee had contact regarding the Company's activity, products or services … or about whom the Optionee learned Confidential Information during employment related to the Company's provision of products or services to such Company provider or customer." (*Id.* § 8(b).)

United alleges that Corzine breached both covenants in his role at Humana. Corzine responds that the covenants are unenforceable. He also argues that, to the extent covenants are enforceable, he did not breach them. Because Corzine claims that the covenants are either (1) unenforceable or (2) that he did not breach them to the extent they are enforceable, the Court will first analyze whether and to what extent the covenants are enforceable before discussing whether Corzine likely breached the covenants.

### 1. Enforceability Under Delaware Law

Corzine challenges the enforceability of the covenants. Both agreements contain the same Delaware choice-of-law provision, "without regard to [Delaware's] conflict of laws principles[.]" (Ex. 93, § 15; Ex. 94 § 11(h).) "When interpreting contracts in a diversity action," courts in the

Sixth Circuit "generally enforce the parties' contractual choice of governing law." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).  Thus, the Court will enforce the choice-of-law provision and interpret the agreements according to Delaware law without engaging in Delaware's conflict of laws analysis. [1]

Under Delaware law, a restrictive covenant is enforceable if it: (1) meets general contract law requirements; (2) is "reasonable in scope and duration, both geographically and temporally"; (3) advances a "legitimate economic interest of the party enforcing the covenant"; and (4) survives a balance of the equities.  *All Pro Maids, Inc. v. Layton*, No. CIV.A. 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005).   Delaware law gives courts discretion to "blue pencil" an overly broad non-compete and enforce the covenant's restrictions to the extent reasonable.  *FP UC Holdings, LLC v. Hamilton*, No. CV 2019-1029-JRS, 2020 WL 1492783, at *8 (Del. Ch. Mar. 27, 2020) (citing *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969)).  Delaware courts have blue-penciled restrictive covenants by reducing the covenant's duration or reducing its geographical scope.  *See, e.g.*, *RHIS, Inc. v. Boyce*, No. CIV. A. 18924, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001) (declining to enforce two-year duration and instead granting an injunction for one year); *Norton Petroleum Corp. v. Cameron*, No. CIV.A . 15212-NC, 1998 WL 118198, at *5 (Del. Ch. Mar. 5, 1998) (declining to enforce a 100-mile-radius restriction and instead enforcing a 20-mile-radius restriction when the plaintiff offered no evidence of protectable business interests beyond a 20-mile radius).

Analyzing the four enforceability requirements, the Court concludes that the covenants are

---

[1] The parties submit that some of Corzine's earlier Option Awards and RSU Awards contain a Minnesota choice-of-law provision.  The parties thus advance their arguments under both Minnesota and Delaware law. However, because the most recent agreements—and the only agreements admitted into evidence during the hearing—contain a Delaware choice-of-law provision, the Court will analyze the contracts under Delaware law.  The Court notes that the enforceability factors in Delaware and Minnesota are not different in any material way.  *See United Healthcare Servs., Inc. v. Louro*, No. CV 20-2696 (JRT/ECW), 2021 WL 533680, at *3 (D. Minn. Feb. 12, 2021). Neither party argues that applying Minnesota law as opposed to Delaware law will affect the Court's disposition.

enforceable.  However, the duration of the covenants should be reduced to run from the date of Corzine's termination, not from the last vesting date of his equity.

### a.   General Contract Principles

The essential elements of a contract—offer, acceptance, and consideration—are not in dispute. The award of stock is sufficient consideration for a restrictive covenant.  *See Newell Rubbermaid Inc. v. Storm*, No. CV 9398-VCN, 2014 WL 1266827, at *9 (Del. Ch. Mar. 27, 2014).

### b.   Reasonable Scope and Duration

**Geographic scope**.  "Delaware law does not impose a strict requirement that the area covered by the covenant map perfectly onto the geographical area of the plaintiff's business." *Kan-Di-Ki, LLC v. Suer*, No. CV 7937-VCP, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015). If the employer's business "extends throughout the nation . . . and the employee would gain from the employment some advantage in any part of that market," a nationwide geographic restriction is reasonable.  *Id.*  Here, the covenants apply on a nationwide basis. (Ex. 93, §4(d); Ex. 94, § 8(d).) Importantly, though, United only seeks restrict Corzine from working on Ohio Medicaid matters. Corzine does not challenge the geographic scope of the covenants.  The geographic scope of the covenants is therefore reasonable because the covenants only restrict Corzine from working in the Ohio market.

**Duration**.  A restrictive covenant is unreasonable if it is longer than necessary to protect the employer's legitimate economic interests.  *RHIS, Inc. v. Boyce*, No. CIV. A. 18924, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001).  "Delaware courts have routinely found restrictive covenants with a duration of two years to be reasonable in duration."  *TP Group–CI, Inc. v. Vetecnik*, No. 1:16-CV-00623-RGA, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016); *see also Norton Petroleum Corp. v. Cameron*, No. CIV.A . 15212-NC, 1998 WL 118198, at *1 (Del. Ch.

Mar. 5, 1998) (enforcing a three-year duration).  That said, the reasonableness of a particular duration depends on the facts of the case and the particular employer's legitimate economic interests.  *See id.*  Delaware courts recognize two legitimate economic interests: protection of the employer's goodwill and protection of the employer's confidential information.  *Elite Cleaning Co. v. Capel*, No. 690-N, 2006 WL 4782306, at *4 (Del. Ch. June 2, 2006).

Here, the restrictions in the Option Award and RSU Award are identical, but the durations differ based on the equity.  Both agreements restrict Corzine from "Engag[ing] in or participat[ing] in any activity that competes, directly or indirectly, with any Company activity, product or service that Optionee engaged in, participated in, or had Confidential Information about during Optionee's last 36 months of employment[.]"  (Ex. 93, § 4(c); Ex. 94, § 8(c).)  However, the non-compete in the Option Award applies "*for the greater of one year after* termination of the Optionee's employment for any reason whatsoever *or* the period of time for which the Option remains exercisable[.]"  (Ex. 93, § 4(c) (emphasis added).)  While the non-compete in the RSU Award applies "for *one year after the later of* (i) the termination of Participant's employment for any reason whatsoever *or* (ii) the last scheduled vesting date under Section 4[.]"  (Ex. 94, § 8(c) (emphasis added).)  As applied to Corzine, because he was eligible for retirement, his equity continued to vest after his October 16, 2019 termination date.  Thus, instead of a one-year restriction measured from October 16, 2019, Corzine's non-compete lasts one year from the last equity vesting date under the RSU Award, which occurred on February 26, 2020. (*Id.*)  And the non-solicitation covenants last two years from February 26, 2020.  (*Id.*, § 8(b).)

Corzine argues that tying the duration of his covenants to the vesting of his equity—instead of the date his termination—is arbitrary and does not protect United's legitimate economic interests.  This Court agrees.  United has an interest in protecting its confidential information, such

21

as its RFA strategy, and protecting its customer goodwill from misappropriation from competitors. But extending the duration of an employee's restrictive covenants based on the vesting of equity is not tailored to protect these legitimate interests. The agreements provide two alternative timelines: the first is a post-termination duration; the second is a post-equity-vesting duration.  The risk that a former employee will trade on the employer's goodwill or utilize its confidential information to gain an unfair competitive advantage has everything to do with the former employee's employment and the information known to the former employee; it has nothing to do with the type of equity the former employee holds and when that equity vests.

This case illustrates the arbitrariness of tying the covenants' durations to the post-termination equity vesting.  Under the RSU Award, his non-compete duration—measured from his last vesting date—is a total of one year and four months post-termination, while his non-solicit duration is a total of two years and four months post-termination.  But suppose that Corzine's equity continues to vest until February 26, 2023, the original last scheduled vesting date. (Ex. 94, § 2.)  In that scenario, Corzine's non-compete would last for over five years post-termination, while the non-solicit would last for over six years post-termination because his last scheduled vesting date under the RSU Award was February 26, 2023.  Suppose instead that Corzine had not been eligible for retirement, or that he had elected to forfeit his remaining unvested equity at termination.  In that scenario, Corzine's non-compete duration would last one year from termination, while the non-solicit would last two years from termination.  These drastic differences in duration, dependent only on post-termination equity vesting dates, have no relation to protecting United's goodwill or confidential information.  Measuring the duration of Corzine's restrictive covenants from his post-termination equity vesting—instead of from the date of his termination—is unreasonable because it is not necessary to "protect the employer's legitimate economic

22

interests." *RHIS, Inc.*, 2001 WL 1192203, at *7.  Thus, the Court will not enforce a duration tied to the vesting of Corzine's equity (under the RSU Award) or the exercise period (under the Option Award).

That does not end the inquiry.  Delaware law gives the Court discretion to enforce the covenants to the extent reasonable.  *FP UC Holdings*, 2020 WL 1492783, at *8.  Corzine asks the Court to limit the duration of both the non-compete covenants and non-solicitation covenants to one year from his termination.

The Court finds it appropriate to enforce the covenants' duration measured from the date of termination, but disagrees that both the non-solicitation and non-competition covenants should be limited to one year.  Without the post-termination equity provisions, the non-solicitation covenants in both the Option Award and the RSU Award would apply for two years from the date of termination.  (Ex. 93, § 4(b); Ex. 94, § 8(b).)  One-year non-competition and two-year non-solicitation durations are reasonable under Delaware law and are routinely enforced.  *TP Group–CI, Inc.*, 2016 WL 5864030, at *2; *see also Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004) ("the Court has previously upheld restrictive covenants of two years or more and the Defendants have offered no reason why such precedent is inapplicable here."); *Quirch Foods LLC v. Broce*, No. 3D20-842, 2020 WL 6053263, at *7 (Fla. Dist. Ct. App. Oct. 14, 2020) ("the one-year non-competition and two-year non-solicitation periods are reasonable and shorter than allowed under Delaware law.").  Corzine offers no reasons why a two-year non-solicitation duration, measured from the date of termination, is unreasonable under Delaware law.

Accordingly, the Court will only consider enforcing Corzine's non-competition covenants for a duration of one year and will only consider enforcing the non-solicitation covenants for a duration of two years from October 16, 2019—the date of his termination from United.

### c. Legitimate Economic Interests of the Employer

Next, the covenants must advance a "legitimate economic interest of the party enforcing the covenant[.]" *All Pro Maids, Inc*, 2004 WL 1878784, at *5. As discussed above, an employer has legitimate economic interests in protecting its goodwill and protecting its confidential information. *Elite Cleaning Co.*, 2006 WL 4782306, at *4.

Corzine argues that United has no legitimate economic interests in restricting his involvement in the RFA process. As to the protection of United's goodwill, Corzine asserts that that an employer's interest in protecting its goodwill is significantly diminished in the context of a public procurement like the 2020 RFA process. As to the protection of United's confidential information, Corzine submits that he has not disclosed any of United's confidential information and argues that the non-disclosure covenants in the Option Award and RSU Award are sufficient to protect United's interests in protecting its confidential information. Corzine also argues that the scope of prohibited activity in the covenants is vague and overbroad.

**Customer goodwill**. An employer has an interest in the economically valuable relationships created by its employees, "which is vulnerable to misappropriation if the former employees are allowed to solicit its customers shortly after changing jobs." *All Pro Maids, Inc.*, 2004 WL 1878784, at *5 (citing *Rsch. & Trading Corp. v. Pfuhl*, No. CIV. A. 12527, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992)). "This is particularly true where … the evidence demonstrates the importance of personal contacts to the success of a company." *Id.* Delaware courts have "repeatedly enjoined former employees from dealing with the customers of their

24

former employers with whom the employee had contact[.]"  *Rsch. & Trading Corp.*, 1992 WL 345465, at *12.

United asserts that the covenants are designed to protect its relationship with the State of Ohio and ODM.   United has an economically valuable relationship with the State of Ohio and ODM; the only way United can operate in the Ohio Medicaid market is through a contract with ODM.  If United's current application for a contract fails, its Ohio plan, which employs over 300 people, will cease to exist.  Corzine played an important role in maintaining United's relationship with ODM.  Although he was not the only Ohio plan employee in contact with ODM, he met weekly with ODM officials and cultivated relationships with a variety of external stakeholders on United's behalf.  United has a legitimate economic interest in preventing Corzine from utilizing these connections to secure a contract for a competitor in direct competition with United.

Corzine pushes back on this point, citing to several non-Delaware cases which generally hold that "personal relationships between employee and customer generally are not-relevant when contracts are competitively bid."  *Ecology Servs., Inc. v. Clym Envtl. Servs.*, 952 A.2d 999, 1008 (Md. Ct. App. 2008); *Laidlaw, Inc. v. Student Transp. of Am.*, Inc., 20 F. Supp. 2d 727, 755 (D.N.J. 1998), *abrogated by ADP, LLC v. Rafferty*, 923 F.3d 113 (3d Cir. 2019) ("goodwill is not relevant in a system that is purely the direct submission of public bids, where the only question is which applicant is the lowest responsible bidder.").  Relying on these cases, Corzine argues that United has no legally protectable goodwill with the State of Ohio and ODM because, in the context of a public bid, "factors such as price and dependability of service are more significant in making sales than the efforts of any group of salespersons."  *Charles P. Young Co. v. Leuser*, 485 N.E.2d 541, 545 (Ill. Ct. App. 1985).  Moreover, given the size and importance of the State's Medicaid contracts, Corzine argues that he has no ability to sway ODM's contract awards.

25

But the Ohio RFA process is not an ordinary government bidding process.  Contracts are awarded based on the scoring of comprehensive applications, and price alone is not the criteria.  Some courts have recognized that, when price is not the sole determining factor, goodwill and customer relationships can play a role in a public entity's decision to award a contract.  *See Prison Health Servs., Inc. v. Umar*, No. CIV.A. 02-2642, 2002 WL 32254510, at \*14 (E.D. Pa. July 2, 2002); *Preferred Meal Sys., Inc. v. Guse*, 557 N.E.2d 506, 513 (Ill. Ct. App. 1990).

The evidence shows that United's customer relationship with ODM—and the relationships Corzine developed with ODM officials while at United—can play a role in the scoring of applications that ultimately dictate the contract awards.  United's ongoing relationship with ODM is directly relevant to the current application.  For example, 85 out of a possible 1000 points on the written applications are devoted to an applicant's "Qualifications and Experience."  (Ex. 159.)  This category considers an applicant's current Medicaid managed-care contracts, meaning that United's relationship with ODM and its performance under the current Ohio Medicaid contract directly impact its application score.  (*Id.*)  And the testimony showed that United's performance under the current Medicaid contract depended on weekly or daily contacts between ODM and United employees, including Corzine, to ensure that United administered its plan according to ODM's priorities.  Of course, Corzine is correct that ODM will not award a contract because of customer loyalty or personal favor.  Still, United has shown that it has an interest in preventing a competitor seeking to enter the market from capitalizing on the relationships United built with ODM through its employees during the performance of the current Medicaid contract.

Corzine himself seemed to consider his relationships with ODM officials as a positive influence for Humana's oral presentation in January 2021.  Following the presentation, Corzine emphasized that he "personally knew all of the state staff on the call with the exception of one

person" in response to an email from a Humana colleague enquiring how the presentation went. (Ex. 109.)  Corzine testified that, out of the six ODM officials to which he was referring in these emails, he came to know five of these officials from his role at United.  Another Humana team member also highlighted Corzine's connections, writing, "[a] number of the state staff said hello to Jeff personally at the introduction part of the orals."  (Ex. 86.)  This evidence undercuts Corzine's contention that he has no ability to influence the outcome of ODM's contract awards. The oral presentations account for roughly 9% of an application's overall score.  That Corzine and other Humana employees valued Corzine's personal connections with the ODM staff on the panel—connections that Corzine developed as a United employee—reflects the reality that Corzine's strong connections and experience in the Ohio Medicaid market could influence the ODM panel's evaluation of Humana's oral presentation.  Unlike United, Humana does not have experience in the Ohio Medicaid market.

**Confidential information.**  United also has a legitimate economic interest in protecting its confidential information related to its RFA strategy and business operation.  Corzine argues that the non-disclosure covenants in the Option Award and RSU Award adequately protect United's interest in protecting its confidential information.  Corzine testified credibly that he has not disclosed or used any of United's confidential information.  He claims that any of the information relied on for the 2020 RFA is public information and that he only relied on his experience as a regulator in the Ohio Medicaid market prior to his employment at United.  However, that Corzine has not affirmatively disclosed United's confidential information does not eliminate United's interest in protecting that information through enforcing the non-competition and non-solicitation covenants.

The court's reasoning in *Radian Guaranty Inc. v. Bolen* explains why.  No. CIV.A. 13-

27

6197, 2014 WL 2777450, at *1 (E.D. Pa. June 19, 2014).  In that case, Radian, a mortgage insurance company, sought a preliminary injunction to enforce a former employee's non-competition, non-solicitation, and non-disclosure covenants after the employee left to work as a Regional Vice President for a competitor preparing to enter the U.S. mortgage insurance market. *Id.* at *1–3.  The former employee, in her role as a Regional Account Manager at Radian, had close relationships with the company's customers and had access to a "wide variety of information that Radian consider[ed] confidential." *Id.* at *2.  Furthermore, the employee was "privy to confidential internal discussions regarding changes to Radian's credit strategy and generally aware of Radian's internal strengths and vulnerabilities." *Id.*  Rejecting the employee's argument that her knowledge of Radian's confidential information could not harm the employer, the court reasoned that, "regardless of any standstill agreement prohibiting solicitation of former customers and any promises not to use confidential information, [the former employee's] knowledge of Radian's strengths, weaknesses and business practices necessarily inform the way that she is managing her current [ ] sales team and the way that she is now competing for business with Radian." *Id.* at *11; *see also WebMD Health Corp. v. Dale*, No. CIV.A. 11-5827, 2012 WL 3263582, at *12 (E.D. Pa. Aug. 10, 2012) ("Because he was exposed to confidential information about WebMD's sales, marketing, and pricing strategies, Mr. Dale would be likely to use that information, either consciously or not, when competing against WebMD in selling online advertising.").

Such is the case here.  Corzine worked at United in an executive leadership position for over a decade prior to joining Humana.  And months prior to participating in Humana's strategy meetings for the 2020 RFA, Corzine participated in United's strategy meetings in preparation for the same RFA.  In those meetings United's executive leadership discussed the plan's strengths and

weaknesses in preparation for the RFA. Of course, United did not consider Corzine as essential to its chances of submitting a successful application; otherwise, it would not have terminated Corzine. But that does not change the fact that Corzine had intimate knowledge of United's confidential RFA strategy and played some role in developing that strategy. Corzine himself listed that his experience "working with Medicaid managed care programs" helped him deliver his best work on Humana's written application. (Ex. 12.) Corzine's experience most relevant to the 2020 RFA came from his 11 years at United. During that time, he worked on several projects related to major changes in the Ohio Medicaid system that were highly relevant to the 2020 RFA.

Whether conscious or unconscious, Corzine's knowledge of United's "strengths, weaknesses, and business practices necessarily inform" his leadership of Humana's Ohio plan and the "way that [he] is now competing for business with" United. *Radiuan Guar. Inc.*, 2014 WL 2777450, at *11. In other words, regardless of whether Corzine actually discloses any of United's strategies, it is not possible for Corzine to lock away his knowledge of United's confidential information, or the insights gained from participating in United's RFA strategy meetings, and only draw upon his pre-United experience while managing Humana's plan. Accordingly, United has a legitimate economic interest in protecting its confidential information through enforcing the non-competition and non-solicitation covenants, "regardless of … any promises not to use confidential information." *Id.*

**Vagueness and overbreadth.** Finally, Corzine also argues that the covenants are vague and broader than necessary to protect United's legitimate interests. The Court disagrees.

Relying on a recent case from District of Minnesota interpreting the same language at issue in this case, Corzine argues that his non-compete is overbroad. *United Healthcare Servs., Inc. v. Louro*, No. CV 20-2696 (JRT/ECW), 2021 WL 533680, at *1 (D. Minn. Feb. 12, 2021). In that

case, United sought a preliminary injunction to enforce a non-compete identical to Corzine's. *Id.* The employee in that case managed underwriting in United's National Accounts. *Id.* at *1. The employee left to work for Anthem, a United competitor, as a VP of Local Accounts Underwriting. *Id.* at *2. In characterizing the employee's role at Anthem, the Court explained that he would be working "in a *different role* and in a *different business segment* than the position he held at United." *Id.* at *4 (emphasis added). And thus, to find that plaintiff had breached his non-compete by working at Anthem would require the court to "read the covenant so broadly as to render it unenforceable." *Id.* Interpreting the specific language, the Court concluded that the phrases "activities," "engaged in," or "participated in" gave United "wide interpretive latitude" and that, "without a more precise definition," the covenants could be particularly limiting for an executive, like [the plaintiff], who engaged even on the fringes of discussions related to United's corporate strategy." *Id.* at *4.

As United points out, Corzine's circumstances are distinguishable. Unlike the employee in *Louro* who worked in a different role and different business segment, Corzine's role at Humana involves the same activities, the same market, and the same procurement process as his role at United. To find that Corzine "directly or indirectly" competed with United in "any Company activity, product or service that [Corzine] engaged in, participated in, or had Confidential Information about during Optionee's last 36 months of employment" requires only a narrow interpretation of the non-compete. (Ex. 93, § 4(c).) Corzine does not explain how this language is overbroad as applied to him. The language used in the covenants incorporates the "activit[ies]" and "service[s]" that a particular employee "engaged in, participated in, or had Confidential Information about[.]" Thus, the more limited an employee's activities, or United services in which the employee was involved, the more limited the covenants' reach.

Corzine only "[e]ngaged in, participated in, or had Confidential Information about" United's Ohio Medicaid services. The covenants' plain meaning only restricts Corzine from competing against United in the Ohio Medicaid market. It does not prohibit Corzine from competing against United in different business segments, even other states' Medicaid markets. The non-compete is therefore not overbroad.

Likewise, the non-solicitation agreement is also not overbroad in scope. The non-solicitation agreement prohibits Corzine from "Solicit[ing] or conduct[ing] business with any business competitive with the Company from any person or entity … who was a Company provider or customer within the 12 months before [Corzine's] employment termination and with whom [Corzine] had contact regarding the Company's activity." (*Id.* § 4(b).) Corzine argues that the covenant is overbroad and vague because it does not define "customer." The plain meaning of the word "customer" means "one that purchases a commodity or service." *Customer*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/customer. In the Medicaid managed care market, this term could only refer to ODM (the one purchasing United's services) or the Medicaid beneficiaries receiving benefits from a managed care organization. It is neither vague nor overbroad.

In sum, enforcing the covenants would advance United's legitimate economic interests, and the covenants are not overbroad.

### d.  Balance of the Equities

Lastly, to be enforceable, the covenants must survive a balance of the equities. *Elite Cleaning Co.*, 2006 WL 4782306, at *4. This element requires the Court to balance the potential harm to the employer if the covenants are not enforced with any "undue hardship on the employee" and the public interest. *Id.* These factors are the same as the remaining factors the Court must

31

analyze under Fed. R. Civ. P. 65 in deciding whether to grant United's motion for a preliminary injunction. To avoid redundancy, the Court will explain its balancing of the equities under the remaining Rule 65 factors rather than under this element as part of whether United has shown a likelihood of success on the merits. For the reasons stated *infra*, the Court concludes that the covenants here survive a difficult balancing of the equities and are therefore enforceable.

Accordingly, the Court will enforce the non-competition covenants for a duration of one year from October 16, 2019 and will enforce the non-solicitation covenants for a duration of two years from October 16, 2019.

### 2.  Breach of the Covenants

Having determined that the covenants are enforceable, the Court turns to whether Corzine breached these covenants. The basic elements of a breach of contract claim are the existence of a duty, breach of that duty, and resulting damages to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003). When interpreting a contract under Delaware law, "the Court will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (citation omitted). The Court must give "clear and unambiguous terms" their "ordinary meaning." *Id.* Ultimately, the Court concludes that Corzine breached both the non-competition and non-solicitation covenants. The Court also concludes that United is entitled to equitable tolling for the time in which Corzine was violating the non-competition covenants.

### a.  Non-Competition

United has demonstrated a high likelihood of success on its claim that Corzine breached his non-competition covenants. The non-competes prevent Corzine from "Engag[ing] in or participat[ing] in any activity that competes, directly or indirectly, with any Company activity,

product or service that Optionee engaged in, participated in, or had Confidential Information about during Optionee's last 36 months of employment with the Company;" or "Assist[ing] anyone in any of the activities listed above." And as discussed above, the Court will enforce these restrictions for a period of one year from Corzine's date of termination, October 16, 2019. Corzine breached the non-competes by participating in Humana's Ohio business development meetings, participating in Humana's RFA planning meetings, and offering early comments on Humana's RFA application all within one year of his termination from United.

In March 2020, only five months after his termination from United, Corzine began participating in weekly meetings with Humana's Ohio business development team. The goal of the business development team was to increase awareness of Humana in Ohio prior to the release of the RFA. Corzine provided updates to the business development team on policy developments in Ohio, including Medicaid developments. Thus, Corzine "participate[d] in" meetings that "directly or indirectly" competed with United, or at the very least, he "assist[ed]" Humana's business development team in competing with United in the Ohio market.

Beginning in April or May of 2020, Corzine started participating in Humana's weekly Ohio RFA strategy meetings. Although the RFA had not been released, the testimony showed that these strategy meetings were vital to the companies' ultimate applications. During these meetings, Corzine provided his interpretation of information released by ODM related to the RFA. Corzine argues that his participation in these meetings cannot be considered competition because he merely relayed publicly available information. But that was not his testimony. He testified that he provided *his interpretation of* publicly available information. Corzine's interpretation of the information released by ODM constitutes a direct contribution to Humana's RFA strategy. Furthermore, after the RFA was released on September 29, 2020, Corzine participated in several

RFA strategy meetings between September 29 and October 15, 2020.  Corzine also offered comments on early drafts of Humana's RFA application prior to October 15, 2020.

Each of these activities contributed toward Humana's goal of submitting a successful application to the 2020 RFA and establishing a managed care plan in Ohio.  Thus, United has carried its burden of demonstrating a likelihood of success on the merits that Corzine, within one year of his termination from United, "participat[ed] in" activities that "directly or indirectly" competed with United in the same services that Corzine "engaged in, participated in, or had Confidential Information about during [his] last 36 months of employment with" United.

### b. Non-Solicitation

United argues that Corzine breached his non-solicitation provision by soliciting the State of Ohio and ODM through the RFA process.  As discussed above, the Court will enforce the non-solicitation covenants running two years from Corzine's termination from United, meaning that the non-solicitation covenants do not expire until October 16, 2021.  Whether Corzine breached the non-solicitation covenant depends on whether ODM is a "customer" and whether Corzine's activities as Humana's Ohio Market Leader during the RFA process constitute a "solicitation."

The non-solicitation agreements restrict Corzine from "Solicit[ing] or conduct[ing] business with any business competitive with the Company from any person or entity … who was a Company provider or customer within the 12 months before [Corzine's] employment termination and with whom [Corzine] had contact regarding the Company's activity, products or services[.]" (Ex. 93, § 4(b); Ex. 94, § 8(b).)  As an initial matter, ODM is a United "customer" under the ordinary meaning of that term.  A customer is "one that purchases a commodity or service." *Customer*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/customer. United is currently in a contract with ODM, under which the State pays for United's services as a

managed care organization.

Corzine argues that, even if ODM is a "customer," neither Corzine nor Humana initiated contact with ODM and thus did not "solicit" ODM in violation of the covenant. Corzine relies on *KPMG Peat Marwick LLP v. Fernandez* for the proposition that, under Delaware law, "solicitation" requires the initiation of contact. 709 A.2d 1160 (Del. Ch. 1998). In that case, KPMG sued to enforce a non-compete contained in a partnership agreement between KPMG and a group of partners who left KPMG to start a competing consulting business called AnswerThink. *Id.* at 1161. The non-compete contained a restriction on the former partners, now running AnswerThink, from soliciting the clients of KPMG without KPMG's consent. *Id.* KPMG claimed that AnswerThink violated the non-compete after a KPMG client wrote to KPMG requesting consent for the client to retain AnswerThink for a project. *Id.* at 1163. The client expressly stated in its letter to KPMG that "it is important for you to understand that we initiated the contact with [AnswerThink]." *Id.* Nonetheless, KPMG claimed that AnswerThink had violated the non-competed by "soliciting" the client. *Id.* In analyzing whether AnswerThink had "solicited" the client, the court acknowledged that there "are circumstances in which it may be hard to determine whether a client's invitation to perform services is 'solicited' or 'unsolicited.'" *Id.* Under the facts of that case, the court concluded that AnswerThink had not committed a solicitation because the "initial contact came from [the client] and there is no evidence to suggest that this contact was itself the product of some other, earlier contact by [AnswerThink]." *Id.*

*KPMG Peat Marwick LLP* did not establish a bright-line rule in Delaware that a person can only "solicit" business they initiate the first contact. And the Court is not aware of any case in Delaware holding as much. Thus, the Court must look to the ordinary meaning of "solicit" in the context of the non-solicitation covenants.

The ordinary meaning of "solicit" does not necessitate making the initial contact.  Merriam-Webster defines the term as "to approach with a request or plea" or "to urge (something, such as one's case) strongly."  *Solicit*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/solicit.  Cambridge defines the term as "to ask for something in a persuasive and determined way."  *Solicit*, Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/solicit. A business need not initiate contact with a customer to nonetheless ask for a customer's business in a "persuasive and determined way." *Id.*

Some courts, such as the Fourth Circuit, have adopted the bright-line interpretation for which Corzine advocates, holding that that "the plain meaning of 'solicit' requires the initiation of contact."  *Mona Elec. Grp., Inc. v. Truland Serv. Corp.*, 56 F. App'x 108, 110 (4th Cir. 2003) (applying Maryland law).  Other courts take the view that solicitation does not require the initiation of contact, but that the "identity of the party making initial contact is just one factor among many that the trial court should consider in drawing the line between solicitation and acceptance in a given case." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 12 (1st Cir. 2013) (applying Massachusetts law); *see also Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1111 (D. Colo. 2016) (looking to dictionary definitions and concluding that, "under Colorado law, conduct may fall within the definition of 'solicit' and 'solicitation' even in the absence of Defendants making the initial contact with Wells Fargo's client or customer.").

This Court agrees with the more flexible interpretation. The bright-line approach is inconsistent with the ordinary meaning of "solicitation."  And holding otherwise would be inconsistent with the "parties' intentions as reflected in the four corners of the agreement." *GMG Cap. Invs., LLC*, 36 A.3d at 779.  As the District of Columbia described in *Legal Technology*

*Group, Inc. v. Mukerji*, the common definitions of "solicit" "explicitly include conduct that does not require an actor to initiate contact or even make a request, but only require 'seeking to obtain something' or making 'an attempt or effort to gain business.'"  No. CV 17-631 (RBW), 2019 WL 9143477, at *10 (D.D.C. June 10, 2019) (citing *Black's Law Dictionary* 1607–08 (10th ed. 2014)). Under this interpretation, "merely accepting business, without taking any other action to obtain it, does not constitute solicitation." *Id.* at *11 (citing *Akron Pest Control v. Radar Exterminating Co.*, 455 S.E.2d 601, 603 (Ga. Ct. App. 1995)) (internal quotations omitted).  But "efforts to prepare and submit a proposal for a client's business fall squarely within the plain meaning of solicit." *Id.*

Corzine undertook substantial "efforts to prepare and submit a proposal" to secure ODM and the State of Ohio's business for Humana. *Id.*  After taking over as Ohio Market Leader, Corzine oversaw the submission of Humana's application to ODM, a proposal meant to convince ODM to award Humana a Medicaid contract over its competitors—or to award Humana a better contract than its competitors.  Corzine also participated in the RFA's oral presentation component—the ultimate purpose of which was to "to urge (something, such as [Humana's] case) strongly." *Solicit*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/solicit. This case is not one of Humana merely accepting an unprompted offer from ODM to provide managed care services.  Even if ODM's public issuance of the RFA is considered the "initial contact," Corzine's activities as Humana's Ohio Market Leader fall within the ordinary meaning of the word "solicit."

Accordingly, because Corzine solicited business from an "entity … who was a [United] provider or customer within the 12 months before [Corzine's] employment termination and with whom [Corzine] had contact regarding the Company's activity, products or services[,]" United has demonstrated a strong likelihood that Corzine breached his non-solicitation covenants.

### c. Tolling

United has asked the Court to equitably toll the duration of the covenants to account for the time in which Corzine was violating the covenants.  Corzine's non-competition covenants expired on October 16, 2020, while his non-solicitation covenant does not expire until October 16, 2021.  Corzine argues that tolling is not appropriate here because the non-compete has expired and because United did not include a clause in the Option Award or RSU Award providing for the tolling the duration of the non-compete.

Despite the absence of a tolling provision in the covenants, the Court finds that United is entitled to time credit for Corzine's non-compete violations.  United was diligent in its correspondence with Humana in December of 2019 to ensure that Corzine would not be violating his covenants, telling Humana that Corzine "should not engage in any activity related to Humana providing managed care services in Ohio or any efforts to obtain a contract regarding same.  He should not share any information regarding the Ohio market or UnitedHealthcare's plan in Ohio with an individual that might work on efforts to obtain a Medicaid contract in Ohio." (Ex. 123.) And despite Corzine making efforts to avoid non-compete violations, the testimony clearly established that Corzine began violating the non-competes in March of 2020 and continued to violate the non-competes until October 16, 2021, a period of seven months.  For these seven months, United did not receive the benefit of the bargain with Corzine.  Humana also did not have any process in place to ensure that Corzine was screened off Ohio Medicaid matters, nor did Humana inform United that Corzine had moved into the Ohio Market Leader Role on October 16, 2020.

Furthermore, United moved quickly to protect its interests after learning of Corzine was working on Humana's ODM application.  The equities therefore counsel in favor of granting

38

United time credit for the seven months in which Corzine was violating his non-competition covenants. Thus, Corzine's non-competition covenants shall remain in effect for a period of seven months running from the date of this injunction. *See Kan-Di-Ki, LLC*, 2015 WL 4503210, at *28 (Delaware court rejecting the defendant's argument "that the injunction against should be reduced for the time that elapsed during the pendency of this litigation" because the court did want to "adopt a rule that might incentivize contractual parties to breach their agreements and then run out the clock during litigation.")

United is not entitled to tolling on Corzine's non-solicitation covenants. Unlike with the non-competition covenants, Corzine was not continuously violating the non-solicitation covenants. The only activities that amount to "solicitations" are the submitting of Humana's written application and participation in the January 2021 oral presentation. The non-solicitation covenants will therefore expire on October 16, 2021, two years from Corzine's last day with United.

### B. Irreparable Harm Absent an Injunction

The Court must next consider whether United will suffer irreparable harm absent a preliminary injunction. *Overstreet*, 305 F.3d at 573. The Sixth Circuit has described irreparable harm as "indispensable: If the plaintiff isn't facing irreparable harm, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (emphasis in original). To establish irreparable harm, the movant must show that an injury is "certain and immediate, not speculative or theoretical." *Id.* (citing *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). The movant must also show that the injury is not fully compensable by money damages. *Overstreet*, 305 F.3d at 578. An "injury is not fully compensable by money damages if the nature of the plaintiff's loss

would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (citation omitted).

The "likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate." *Id.* Likewise, "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)).

United has suffered "interference with customer relationships" and the "loss of fair competition" as result of Corzine's breach of the non-competition and non-solicitation covenants. And the stakes for the competition here are high. The existence of United's Ohio plan, a business that employs over 300 hundred people, depends entirely on obtaining a contract from ODM through this procurement. Furthermore, Corzine acknowledged in signing the Option Award and RSU Award that any breach of the restrictive covenants would result in immediate and irreparable harm to United. (Ex. 93, § 12; Ex. 94, § 11(f).); *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 308 (6th Cir. 2019) (stating that a contractual stipulation to irreparable harm is one piece of evidence to consider in finding irreparable harm). It is also difficult to quantify the impact Corzine's breaches will have on the final award notifications.

As Corzine argues, however, much of the alleged irreparable harm has already occurred. The application period is closed, and the applications are being evaluated by ODM. The parties are in a no-contact period and are waiting for ODM to issue award notifications any day now. The contract awards were scheduled to be announced in January 2021, but as of the date of this opinion in March 2021, ODM has not issued award notification letters. At this point, no injunctive relief can affect ODM's initial selections.

Nonetheless, the RFA process is not finished because aggrieved parties have an opportunity to file a protest regarding ODM's award selection.  The process remains ongoing until the Provider Agreements are executed after the protest period.  (Ex. 159.)  The Court therefore finds that United will continue to suffer immediate irreparable harm in the form of "interference with customer relationships" and the "loss of fair competition" through Corzine's continued participation in the RFA process.  However, any alleged harm that United could suffer if both United and Humana are awarded contracts—and therefore become competitors in the Ohio Medicaid market for the duration of the contract—is too speculative to warrant injunctive relief at this time.  It is unknown which managed care organizations will be awarded contracts and which regions within the state the organizations will be assigned.

Corzine's citation to this Court's decision in *Exel Inc. v. Xpedient Management Group, LLC*, does not change the analysis.  No. 2:17-CV-1076, 2018 WL 456315, at *6 (S.D. Ohio Jan. 16, 2018).  In that case, this Court found that the irreparable harm factor weighed against injunctive relief in a competitive bid context because the former employee obtained "alleged confidential information" about the former employer *after* the former employee submitted a competing bid.  *Id.*  As the Court distinguished in that case, the irreparable harm analysis is different when, as here, the former employee obtains confidential information about his former employer's competitive bid *before* the former employee submits a competing bid.  *Id.*  It is undisputed that Corzine participated in United's confidential RFA strategy meetings *before* competing against United for the same Medicaid contract while at Humana.

Accordingly, United has shown that it will suffer immediate and irreparable harm absent a preliminary injunction, but only until the procurement process is finished and the Provider Agreements are executed.

### C.  Substantial Harm to Others

The third factor the Court must balance is whether "the issuance of the injunction would cause substantial harm to others[.]"  *Overstreet*, 305 F.3d at 573.  Granting injunctive relief without causing harm to Corzine is unavoidable in this case.

Corzine argues that an injunction would prevent him from working in his chosen profession where he has spent decades developing expertise (including several years before his time at United).  He also argues that the injunction would deprive him of the ability to provide for his wife, young daughter, and his mother, because it would be difficult to obtain alternative employment at the age of 62.  Indeed, Corzine explained how each state's Medicaid program is unique and that his expertise is in Ohio Medicaid, developed years before he started working for United in 2008.  The Court does not take lightly the prospect of barring Corzine from working in his chosen area of expertise.

While this injunction will cause harm to Corzine, the Court finds that the harm will not be so substantial as to outweigh the other factors that weigh in favor of granting injunctive relief.  First, the duration of the injunction is limited only until the execution of the Provider Agreements.  For now, Corzine is not enjoined from working for Humana in Ohio Medicaid after the contract awards are fnal.  Second, although Corzine's expertise is in Ohio Medicaid, Corzine worked for eight months as Humana's South Carolina Market Leader.  Corzine performed this role working remotely from his home in Columbus, Ohio.  That Corzine was able to lead a managed care organization for Humana in another market undercuts his assertion that he will not be able to obtain alternative work at Humana or another employer if he is barred from working in the Ohio Medicaid market.  The covenants do not prevent Corzine working for Humana in another state's Medicaid market or in a national role at Humana, and neither does this injunction. Accordingly, this factor

weighs somewhat against granting injunctive relief, but does not outweigh the other three factors weighing in favor of granting an injunction.

### D. Public Interest

The final factor to consider is whether the public interest favors injunctive relief. *Overstreet*, 305 F.3d at 573. The "enforcement of contractual duties is in the public interest." *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 551. Including the enforcement of "reasonable restrictive covenants." *D.P. Dough Franchising, LLC v. Southworth*, No. 2:15-CV-2635, 2017 WL 4315013, at *16 (S.D. Ohio Sept. 26, 2017). The public interest is also "served by fair competition[.]" *Id.* Here, enforcing the restrictive covenants to the extent reasonable promotes fair competition and holds parties to their contractual duties. Therefore, the public interest favors issuing a preliminary injunction. On balance, the factors under Rule 65 counsel in favor of granting United a preliminary injunction, but not to the extent United requests.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is **GRANTED IN PART**. (ECF No. 2.) The Court **ORDERS** that Defendant Jeffrey Corzine is prohibited from employment in any role at Humana related to Humana's Ohio Medicaid business and is prohibited from engaging in any activity that breaches his non-competition or non-solicitation covenants, consistent with this opinion, until the Ohio Medicaid contract awards are finalized and the Provider Agreements are executed. If the Provider Agreements have not been executed by October 16, 2021, Defendant may move to lift this injunction.

**IT IS SO ORDERED.**

3/15/2021                     s/Edmund A. Sargus, Jr.
DATE                       EDMUND A. SARGUS, JR.
                                UNITED STATES DISTRICT JUDGE